UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| PATRICK AYERS, Derivatively on Behalf of MANHATTAN ASSOCIATES, INC., | No. |
| | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Plaintiff, | |
| v. | |
| EDDIE CAPEL, DENNIS B. STORY, THOMAS E. NOONAN, EDMOND I. EGER III, LINDA T. HOLLEMBAEK, KIMBERLY A. KURYEA, CHARLES E. MORAN, DEEPAK RAGHAVAN and JOHN J. HUNTZ | |
| Defendants, | |
| -and- | |
| MANHATTAN ASSOCIATES, INC., a Georgia Corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff Patrick Ayers, by his attorneys, submits this Shareholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Manhattan Associates, Inc. ("Manhattan" or the "Company") against certain of its officers and directors for violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in significant damages to Manhattan's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      Headquartered in Georgia, Manhattan is a global software company that provides supply chain and omnichannel commerce solutions[1] to help businesses with inventory optimization, fulfillment, and customer experiences.  The Company also offers services.

3.      Manhattan's critical operations segments include its Professional Services Organization and Customer Services Organization ("the Services Segment" or "Services"), which accounted for more than 50% of the Company's 2024 full-year revenue.  The Services Segment provides customers with supply chain and enterprise commerce domain expertise.  This includes industry-specific "best-practices" protocols and processes.  The Services Segment assists customers in all phases of implementing the Company's systems, including planning and design, customer-specific module configuration, and on-site implementation.  According to defendant Eddie Capel ("Capel"), the Company's former President and Chief Executive Officer ("CEO"), the Services Segment is the Company's "secret weapon".

4.      Manhattan historically offered on-premises software.  This meant that the Company's Services Segment would install Manhattan's proprietary software on a customer's own servers, perform updates and servicing when necessary, and

---

[1] Omnichannel commerce solutions are software tools that link together a company's different sales channels (such as stores, websites, mobile apps, and call centers) so that inventory, orders, and customer information are shared across all of them.

provide support services.   Upgrading and serving these on-premises software systems was expensive and required manual input from Manhattan specialists. Manhattan would charge its clients for this work.

5.      However, in an effort to remain competitive as industry trends moved toward cloud-based products and services, the Company shifted its focus, offering cloud-based software to its new and existing customers.  Manhattan's cloud-based software is hosted on remote, third-party servers that customers can access through the internet.  As a result, the cloud-based software did not require the same level of maintenance and other ancillary services as its on-premises products did.

6.      The Individual Defendants (as defined herein) presented this shift as a positive for Manhattan.  They told investors that the Company's "best-of-breed cloud-native platform" was "fuel[ing] service revenue growth for Manhattan." However, despite statements that Manhattan's cloud-based offerings would foster growth of Services Segment revenue, the introduction of the Company's cloud-based software eroded the Company's ability to generate Services Segment revenue and stunted Services Segment growth due to the lack of on-premises work. Moreover, Manhattan's cloud-based software was often faulty and failed to work as well as its legacy on-premises software.

7.      Despite knowing that Manhattan's cloud-based products caused a decline in Services' demand, the Individual Defendants made materially false and

misleading statements to investors emphasizing the consistent growth of the Company's Services Segment, which artificially inflated Manhattan's share price. Notably, the Individual Defendants reported that Services revenue would increase in Fiscal Year ("FY") 2025.

8.    The Individual Defendants also misled the public regarding the Company's hiring posture of Services employees.  After enacting a hiring freeze of Services employees and conducting rounds of layoffs, defendant Capel still told investors, during the Company's second quarter 2024 earnings call, that Manhattan plans "to continue to hire" and that those "hires will be largely in customer-facing roles."  These statements gave the misleading impression that Manhattan's Services demand had increased to such a level to require additional labor resources.

9.    Instead of promptly disclosing this material information to Manhattan investors, the Individual Defendants continued to mislead them regarding the Services Segment, keeping the Company's stock price trading at artificially inflated levels.  Despite the knowledge of waning demand in one of the Company's key segments, the Director Defendants (as defined herein) caused the Company to spend over $93.5 million to repurchase 354,294 shares of its common stock at inflated prices.

10.    After months of misrepresenting the strength of Manhattan's Services business, the relationship between cloud products and Services demand, and the

Company's hiring posture for Services employees, the Individual Defendants revealed the truth through a series of partial disclosures. On October 22, 2024, during after-market hours, the Company held a third quarter 2024 ("Q3 2024") earnings call. During the call, the Individual Defendants revealed that they expected fourth quarter 2024 ("Q4 2024") Services revenue of $121.5 million, a $15.5 million decline from Q3 2024. The Company also lowered its total revenue projection for Q4 2024 by $3.5 million, which represented a $10.8 million sequential decline from Q3 2024.

11.    On this news, the Company's market capitalization plunged more than 7.17%, or $20.96 per share, on October 23, 2024, to close at $271.36 per share compared to the previous trading day's closing of $292.32 per share, erasing almost $1.3 billion in market capitalization in a single day.

12.    Then, on January 28, 2025, during the Company's Q4 2024 earnings call, the Individual Defendants further disclosed that Q4 2024 Services revenue was $119 million, another $2 million below their most recent projections, and a total of $11 million below their projected revenue in Q2 2024. The Individual Defendants further revealed that "near-term headwinds for our services business have surfaced as about 10% of our customers with in-flight implementations reduced their planned services work" and revised the Company's FY 2025 projections from $1.13–$1.14

billion down to $1.06–1.07 billion for total revenues and from $565–$575 million down to $494–$500 million for Services revenue.

13.     On this news, the Company's market capitalization plunged more than 33.41%, or $98.59 per share, from January 29 through February 4, 2025, to close at $196.51 per share compared to January 28, 2024's closing of $295.10 per share, erasing over $6 billion in market capitalization over several days.

14.     The truth was further revealed on February 10, 2025, when the Company announced that defendant Capel was retiring that same week from his officer positions, but continued to serve on the Board.  On this news, the Company's market capitalization plunged more than 11.55%, or $23.20 per share, on February 10, 2025, to close at $177.70 per share compared to the previous trading day's closing of $200.90 per share, erasing almost $1.5 billion in market capitalization in a single day.

15.     As a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit in the U.S. District Court for the Northern District of Georgia on behalf of investors who purchased Manhattan's shares titled *Prime, et al. v. Manhattan Associates, Inc. et al.*, Case No. 1:25-cv-00992 (the "Securities Class Action").

16.     On May 29, 2025, plaintiff sent a litigation demand to Manhattan's Board detailing the wrongdoing alleged herein, demanding that the Board

investigate and bring litigation against the culpable fiduciaries (the "Demand"). Ninety days have passed since plaintiff made his Demand, yet the Board and the Board's counsel King & Spalding LLP ("Demand Counsel") have refused to make any decision regarding whether to accept or reject the Demand.  Further, the Board and Demand Counsel have not indicated that the Board has taken any actions to reform or improve the Company's corporate governance and internal procedures. Accordingly, the Board has effectively, and wrongfully, refused the Demand.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims raise a federal question under section 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1) and section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R §240.10b-5) and SEC Rule 10b-5 promulgated thereunder.  This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

19.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render

the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Manhattan maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Manhattan, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

21.    Plaintiff Patrick Ayers was a shareholder of Manhattan at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Manhattan shareholder.

**Nominal Defendant**

22.    Nominal Defendant Manhattan is a Georgia corporation with principal executive offices located at 2300 Windy Ridge Parkway, 10th Floor, Atlanta, Georgia.    Manhattan develops, sells, deploys, services and maintains software

solutions designed to manage supply chains, inventory and omnichannel operations for retailers, wholesalers, manufacturers, logistics providers and other organizations. It runs Manhattan Active® applications in the cloud and delivers them as subscription-based software as a service (SaaS). As of December 31, 2024, Manhattan had 4,690 employees.

**Defendants**

23. Defendant Capel has been Manhattan's Executive Chairman since May 2025. He was also Manhattan's Executive Vice-Chairman from February 25, 2025 to May 2025; President and CEO from January 2013 to February 2025; director from July 2012 to February 2025; President and Chief Operating Officer from July 2012 to December 2012; Executive Vice President and Chief Operating Officer from January 2011 to July 2012; Executive Vice President of Global Operations from January 2009 to January 2011; Executive Vice President of Global Product Management and Customer Services from January 2008 to January 2009; Senior Vice President of Global Product Management and Global Customer Services from January 2005 to January 2007; and Senior Vice President of Product Management from January 2004 to January 2005. Defendant Capel is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Manhattan paid defendant Capel the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2024 | $725,000 | $9,100,094 | $920,750 | $43,831 | $10,791,699 |

24.     Defendant Dennis B. Story ("Story") has been Manhattan's Executive Vice President since January 2011, and also Chief Financial Officer and Treasurer since March 2006.  He was also Manhattan's Senior Vice President from March 2006 to January 2011.  Defendant Story is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Manhattan paid defendant Story the following compensation as an executive:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2024 | $493,000 | $1,950,114 | $482,600 | $35,369 | $2,961,083 |

25.     Defendant Thomas E. Noonan ("Noonan") has been a Manhattan director since January 1999.  He has been a member of Manhattan's Audit Committee since at least March 2023.  Manhattan paid defendant Noonan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $90,000 | $260,054 | $350,054 |

26.    Defendant Edmond I. Eger III ("Eger") has been a Manhattan director since October 2015.  He has been a member of Manhattan's Audit Committee since at least March 2023.  Manhattan paid defendant Eger the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $70,000 | $260,054 | $330,054 |

27.    Defendant Linda T. Hollembaek ("Hollembaek") has been a Manhattan director since May 2018.  Manhattan paid defendant Hollembaek the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $65,000 | $260,054 | $325,054 |

28.    Defendant Kimberly A. Kuryea ("Kuryea") has been a Manhattan director since May 2022.  Defendant Kuryea has also been Chair of Manhattan's Audit Committee since at least August 2025 and a member of that committee since at least March 2023.  Manhattan paid defendant Kuryea the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $70,000 | $260,054 | $330,054 |

29.     Defendant Charles E. Moran ("Moran") has been a Manhattan director since May 2017.  Manhattan paid defendant Moran the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $67,500 | $260,054 | $327,554 |

30.     Defendant Deepak Raghavan ("Raghavan") was a Manhattan director from February 1998 to May 2025; Senior Vice President of Product Strategy from January 2001 to June 2002; Senior Vice President from August 1998 to January 2001; and Chief Technology Officer from October 1990 to August 1998.  He co-founded the Company in October 1990.  Manhattan paid defendant Raghavan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $70,000 | $260,054 | $330,054 |

31.     Defendant John J. Huntz ("Huntz") was Manhattan's Chairman of the Board from May 2003 to May 2025 and a director from January 1999 to May 2003. He was the Chair and a member of Manhattan's Audit Committee from at least March 2023 to at least April 2024.  Manhattan paid defendant Huntz the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $192,500 | $260,054 | $452,554 |

32.     The defendants identified in ¶¶23–24 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶25–31 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶25, 26, 28, 31 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶23–31 are referred to herein as the "Individual Defendants."

**Relevant Non-Parties**

33.     Non-defendant Eric A. Clark ("Clark") has been Manhattan's President, Chief Executive Officer and a director since February 12, 2025.

34.     Non-defendant Danielle Sheer ("Sheer") has been a Manhattan director since May 13, 2025.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

35.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Manhattan and its shareholders fiduciary obligations of care and were and are required to use their utmost ability to control and manage Manhattan in a fair, just, honest, and equitable manner.  The

Individual Defendants were and are required to act in furtherance of the best interests of Manhattan and not in furtherance of their personal interest or benefit.

36.    To discharge their duties, the officers and directors of Manhattan were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Manhattan were required to, among other things:

(a)    Provide truthful and accurate information regarding the Company's Services Sector and financial health;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)    remain informed as to how Manhattan conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

37.    Manhattan maintains a Global Ethics and Compliance Program (the

"Ethics Program") encapsulated in the Company's Global Ethics and Compliance Manual (the "Ethics Manual").  According to the Ethics Manual, the Ethics Program "applies to our directors, officers, employees, contractors, and others working on behalf of Manhattan . . ." and serves to ensure that "all of us together can exercise appropriate diligence in preventing unethical conduct and violations of laws, regulations, or company policies."   Under the section entitled "2.7 Accounting Integrity and Internal Controls," the Ethics Manual states:

> ***Manhattan Associates' policy is to comply with all applicable accounting rules and regulations, and all applicable rules and regulations relating to public disclosure of information concerning the Company***. ***Our Company's public filings and other public disclosures must be free of material misstatements and misleading omissions***. Our financial books, records, and statements should reflect accurately all financial transactions of the Company and should present fairly in all material respects our financial condition, all assets and liabilities, results of operations, and cash flows. No false entries may be recorded in the Company's books or records for any reason.
>
> We maintain a system of internal controls to ensure reliability and adequacy of our books and records, proper recording of all transactions, and compliance with applicable laws and regulations. . . .
>
> ***You are responsible for complying with internal controls applicable to your areas of responsibility***. Further, if you suspect any of our publicly filed reports (such as our filings with the U.S. Securities and Exchange Commission) or other public disclosures contain material inaccuracy or omit material facts that render the disclosure misleading, you must report it through the reporting procedures in our Global Ethics and Compliance Manual. If your suspicion pertains to noncompliance with accounting rules or regulations, or inaccurate or misleading regulatory filings or public disclosure, or if the concern involves an accounting or auditing matter, you should make sure you report it to the

Chief Legal Officer or report it through the Company's Compliance Reporting Line.

**Breaches of Duties**

38.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

39.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in materially false and misleading statements, improper practices that wasted the Company's assets, and caused Manhattan to incur substantial damage.

40.    The Individual Defendants, because of their positions of control and authority as officers or directors of Company, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Manhattan has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

41.    In addition to these duties, under its Charter in effect since October 20,

2022, the Audit Committee Defendants owed specific duties to Manhattan to assist the Board in overseeing statements concerning the Company's revenue and growth prospects. In particular, the Audit Committee's Charter requires the Audit Committee to oversee the Company's financial statements, accounting and financial reporting processes and system of internal controls over financial reporting of the Company and its audits, and the Company's risk exposure. Moreover, the Audit Committee Charter listed the responsibilities of the Audit Committee:

> While the Committee has the duties and responsibilities set forth in this Charter, management has primary responsibility for the financial statements and the reporting process, including the system of internal control over financial reporting and management's report thereon. Further, the Company's independent accountants are responsible for performing an audit of the Company's consolidated financial statements in accordance with auditing standards generally accepted in the United States, for expressing an opinion as to their conformity with generally accepted accounting principles, for reviewing the Company's quarterly financial statements and for attesting to management's report on the Company's internal control over financial reporting. It is the Committee's responsibility to monitor and oversee those processes.
>
> ***In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company, and has the authority to engage independent counsel and other advisers as it determines necessary to carry out its duties.*** The Company will provide funding, as determined by the Committee, for payment of compensation to the independent accountants and to any advisers the Committee retains, and ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

*    *    *

A. <u>Review of Financial Statements, Reports and Charter</u>

***The Committee will review the Company's financial statements, reports and other financial information, in conjunction with the Company's internal financial management and independent accountants, as appropriate***. That review generally will include candid discussions of the quality—not merely the acceptability—of the Company's accounting principles as applied in its financial reporting. Reviews will occur prior to dissemination of the statement, report or other document to a third party or the public. Without limitation, the Committee will review, to the extent it deems necessary or appropriate:

1. The annual financial statements and other material financial content of the Company's Annual Reports to Shareholders and/or Annual Reports on Form 10-K.

2. ***Any quarterly or other interim financial statements and other material financial content of the Company's Quarterly Reports on Form 10-Q***.

3. ***Any other material external financial information, such as earnings releases***.

4. Any material internal reports prepared by the independent accountants, internal auditors or management.

5. This Charter on an annual basis, or more frequently as circumstances dictate.

***The Chair of the Committee may represent the entire Committee for purposes of reviewing quarterly information, other material external financial information, such as earnings releases, or internal reports to the extent permissible under the listing requirements of Nasdaq and generally accepted auditing standards***.

\*     \*     \*

C. <u>Financial Reporting and Auditing Processes</u>

1. ***Oversee the integrity of the Company's financial reporting process, both internal and external***.

2. Discuss with the independent accountants, internal auditors and management the overall scope and plans for their respective audits and the results of their audits, including any critical audit matters identified.

3. Receive from the independent accountants and discuss as appropriate the communications required by applicable rules of the Public Company Accounting Oversight Board.

4. *Review with the independent accountants, the internal auditors and management the adequacy and effectiveness of the Company's internal control over financial reporting, including management's report on the adequacy or effectiveness of internal control over financial reporting and the fullness and accuracy of the Company's financial statements*.

5. Review the quality and appropriateness of the Company's accounting principles and underlying estimates as applied in its financial reporting, including the independent accountants' judgments concerning the foregoing. The Committee will consider the quality of presentation of, among other matters, critical accounting policies, off-balance sheet transactions and financial measures presented on a basis other than in accordance with generally accepted accounting principles.

6. In consultation with the independent accountants, management and the internal auditors, review any major changes or improvements to the Company's financial and accounting principles and practices and internal control over financial reporting.

7. Recommend to the Board whether the Company's audited financial statements should be included in its Annual Report on Form 10-K, and approve the publication of the annual report of the Committee disclosing such recommendation.

42.    The Audit Charter also required the Audit Committee to oversee risk regarding ethical and compliance concerns.  In particular, the Audit Charter stated:

D. Ethical and Corporate Compliance and Other Risk Management

1. *Establish and oversee procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters*…

3. ***Oversee management's development and administration of an appropriate ethics and corporate compliance program, including a code or codes of ethics and business conduct.*** The Committee will review requests for and determine whether to grant or deny waivers of the Company's code of ethics applicable to directors and executive officers.

4. ***Oversee management's development and administration of policies and practices for identifying, assessing, monitoring, and managing Company risk exposures to the extent the Board assigns oversight of those risk exposure areas to the Committee***.

43.    While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, the Audit Committee Defendants failed to fulfill these responsibilities.  In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and omissions of material fact described herein.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

44.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

- 20 -

45.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Company, regarding the Individual Defendants' management of Company's operations, including projected revenue and growth in the Company's Services Segment; and (ii) enhance the Individual Defendants' executive and directorial positions at Manhattan and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

46.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning revenue growth in Manhattan's Services Segment.

47.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly issue materially false and misleading statements concerning demand in the Services Segment.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

48.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## MANHATTAN IS RELIANT ON ITS SERVICES SEGMENT

49.    The Company has grown into a $1 billion revenue company that provides software solutions designed to manage supply chains for retailers, wholesalers, manufacturers, logistics providers, and other organizations.  Manhattan generates revenue through cloud-based software subscriptions, software licenses, maintenance contracts, hardware sales, and related services.

50.    The Company offers its software products as either on-premises (hosted locally on its customers' servers) or on the cloud (hosted remotely on third-party servers).  In an effort to remain competitive against its industry competitors, and because cloud-based software offers higher revenues per user, since at least July 24, 2024, Manhattan focused on transitioning many of its on-premises customers to cloud-based services.

51.    The Company's products include supply chain software intended to manage the warehousing, distribution, and transportation of a company's products. For instance, the Company offers its Warehouse Management Solutions ("WMS") software for distribution management. The WMS software coordinates inventory and data across a distribution center. For transportation management, Manhattan offers its Transportation Management Solutions ("TMS") software, which helps shippers plan and execute transportation requirements. For order management, Manhattan provides its Order Management System ("OMS") that helps retailers fulfill orders by showing inventory and managing order fulfillment. One of Manhattan's critical operations segments is its Services Segment.

52.    Defendant Capel explained that Manhattan's Services business is a key driver of the Company's total revenues. For instance, during a Baird Global Consumer, Technology & Services Conference, held on June 6, 2023, an analyst asked defendant Capel if he considered the Company's Services Segment "dependable." In response, defendant Capel affirmed that Manhattan's Services business was "important to us," expanding that: "[i]t's a large part of our revenue, but it's important for, we believe, to drive ROI and customer satisfaction and even more strategically for us to be able to be very close to our customers and understand what product roadmap and footprint needs will look like going forward."

53.     Defendant Capel also touted its Services business model as one that differentiates the Company from its competitors.  On March 4, 2024, during a Raymond James Institutional Investor Conference, defendant Capel emphasized that: "the real key differentiator for us having our services guys side by side with the customers is we know exactly what's going on in the marketplace.  So, we've been very fortunate over the years to – we've never build [sic] new products that haven't gone anywhere.  We tend to build products that the market needs and that's one of the key ways that we get that intelligence."

54.     Over the years, an increasing share of Manhattan's Services revenues has come from its cloud-based products—rising from 55% of Service revenues in 2022 to 70% in 2023 and reaching 75% in 2024.

55.     Analysts widely accepted that Manhattan's cloud adoption was a key driver of the Company's Services growth.  For example, a Morningstar analyst report dated January 1, 2024, recognized that: "[t]he firm continues to find success in migrating its customers to the cloud, which in turn also increases services revenues." Further, an Equisights Research ("Equisights") analyst report dated May 2, 2024, noted that the Company's cloud subscriptions drove an increase in Services revenues during Q1 2024:

> The 14% growth in services revenue, totaling $132 million in the first quarter, highlights Manhattan Associates' successful diversification and expansion in its service offerings. ***This growth is directly linked to the robust performance and expansion of their cloud solutions, as***

*these technologies require complementary services such as implementation, training, and ongoing support.* The record number of over 100 customer go-lives in this quarter alone reflects the effective execution and delivery capabilities of Manhattan's professional services team. *Such a high level of activity not only boosts immediate revenue but also solidifies client relationships* by ensuring successful adoption and maximization of the software's capabilities. *Manhattan Associates is actively investing in their services sector by scaling their operations to support the anticipated increase in demand following their product innovations and cloud services expansion.* This strategy is evidenced by their plans to meet a significant 2024 hiring goal, aiming to onboard several hundred new associates to support growth areas. This expansion in workforce is aligned with their strategic focus on enhancing customer success and broadening their market reach, further enabling them to tap into new industries and regions which could benefit from their integrated supply chain solutions. This proactive approach in building a robust service framework supports sustainable growth by enhancing client engagement and ensuring successful solution deployments across varied industry verticals.

56.    On August 6, 2024, an Equisights analyst report emphasized that: "Services revenue saw a significant increase of $12.2 million, with contributions from the Americas ($9.7 million), EMEA ($1.0 million), and APAC ($1.5 million) segments."  The report further stated that "[t]his increase was primarily driven by the rise in cloud subscriptions, with approximately 75% of professional services revenue related to cloud subscriptions in Q2 2024, up from 68% in Q2 2023." Accordingly, the Company's Services Segment and the revenue it generates is key to its operations.

## MANHATTAN'S SERVICES SEGMENT ERODED BECAUSE OF CLOUD-BASED PRODUCTS

57.     Unbeknownst to the investing public, beginning July 24, 2024, Manhattan began experiencing material headwinds to its revenue and growth prospects.  Specifically, the Company experienced disappointing performance in its Services Sector due to Customers delaying or deferring planned services work with the Company into mid-year 2025.

58.     Despite the Company pushing to transition its customers to cloud-based products, this transition began to have a negative impact on the Company's Services Segment revenues.  As customers moved to the cloud, they began to utilize less of the Company's offered services.

59.     Additionally, the Services segment also suffered because Manhattan's cloud-based software was faulty and riddled with technical issues that prevented Services from being delivered, even if requested by customers.  As explained by multiple former employees in the Securities Class Action, Manhattan's cloud products suffered from systemic flaws, and the Company's customers were often left disappointed.  This led to a further decline in Services revenues given declining customer relationships and the corresponding reputational harm.

60.     The Company's hiring practices and lack of work for its Services Segment employees indicated Manhattan's declining Services Segment

performance.  In the quarter preceding the materially false and misleading statements discussed in more detail below, Manhattan hired 100 new employees.

61.    During Manhattan's Q2 2024 earnings call, defendant Capel emphasized that: "we've hired just over 100 new team members year-to-date and plan on continuing our hiring posture for the remainder of the year."  Later in that call, an analyst asked defendant Capel for more details on the Company's Services hiring posture, and defendant Capel reaffirmed that the Company plans to expand its Services team.  In particular, the analyst asked, "on services, I think there's a commentary about kind of retaining your hiring posture.  Maybe just kind of to double-click on what exactly you meant there in terms of does that imply kind of hiring for replacement or maybe expanding by, let's say, another 100 heads in the kind of back half? Yeah, just any color would be helpful." Defendant Capel responded, "we plan to continue to hire. . . we do definitely plan to expand our team in the second half of the year, for sure. And those hires will be largely in customer-facing and services roles."

62.    This signaled to analysts and investors that demand for the Services Segment was strong.  The next day, on July 24, 2024, a Rosenblatt analyst report noted that the Company's "plans to hire several hundred new employees in 2024" was to "support its Services growth."

63.    However, the demand for these employees did not exist.  Manhattan's Services Segment employees did not have substantive work to do because of: (i) the fact that cloud products inherently required less Services; and (ii) delayed and cancelled contracts resulting from the disappointing underperformance of the Company's cloud-based software.  This lack of work led to a hiring freeze of new Services employees and eventual rounds of layoffs just months after touting the onboarding of new hires.  In a January 28, 2025, press release, Manhattan disclosed that, "[i]n January 2025, the Company eliminated about 100 positions to align our Services capacity with customer demand..." In Manhattan's 2024 Form 10-K, the Company clarified that this layoff of approximately 100 employees happened on January 14, 2025.  Numerous former employees in the Securities Class Action corroborate the lack of work for Services Segment employees and their subsequent terminations.

64.    Additionally, multiple people have shared their insights on Manhattan's layoffs on www.thelayoff.com.  This website offers a discussion board where users can comment on layoffs, job cuts, and other work-force reduction topics for specific companies.  On the www.thelayoff.com website, multiple individuals corroborated the accounts of the former employees and explained that the mass layoffs and firings by Manhattan at the start of 2025 were a result of: (i) lower Services revenues and

improper forecasting for 2024; and (ii) that the cloud-based software products were "riddled" with technical issues.

65.    For instance, on www.thelayoff.com, a user started a thread regarding Manhattan's layoffs and reported that the Company laid off "another 100+" employees in January.  In response to this, a user commented on January 19, 2025, that this "was a strategic decision [from] the upper management to be prepared for this year.  They are having lower revenue on implementation and support [i.e., Services]. Hence, the decision was made to reduce employee count to save money and invest in other portfolios."[2]

66.    Additionally, a second thread was created on www.thelayoff.com to discuss the layoffs.  This thread was created on February 7, 2025, and titled "Anyone else find it funny that none of the bloated [Resource Management] team is getting let go?"  This user goes on to comment that: "[a]pparently these layoffs were all a result of a forecasting error made sometime in 2024 which caused them to overhire in the last few hiring cycles."[3]

_____

[2] Anonymous, Comment to Another 100+ layoff, THELAYOFF (Jan. 19, 2025), https://www.thelayoff.com/t/1jhpa68d3 (last accessed on September 3, 2025).

[3] Anonymous, Comment to Anyone else find it funny that none of the bloated RM team is getting let go?, THELAYOFF (Feb. 7, 2025), https://www.thelayoff.com/t/1jkgw43t0? (last accessed on September 3, 2025).

67.    Another user commented on this thread on February 5, 2025, stating that, "[h]onestly, it was bound to happen. They have been over hiring for that last 2+ years like crazy with very poor management/organization from leadership in general.  Clients are becoming keen that the software suite is riddled with bugs and constantly fails during basic functions/process flows . . . Clients are realizing they're paying premium prices for a subpar product."[4]  The Individual Defendants concealed this material information through materially false and misleading statements, discussed in further detail below.

## INDIVIDUAL DEFENDANTS CONCEAL THE EROSION OF THE SERVICES SEGMENT THROUGH IMPROPER STATEMENTS

68.    From July 24, 2024 through February 10, 2025, the Individual Defendants made, or caused Manhattan to make, materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants misled shareholders by touting the prospects of the Company's Services Segment and customer transitions to the cloud, while failing to disclose that: (i) the Company's revenue growth from its Services Segment was being negatively impacted by customer delays and deferrals; (ii) as the Company's customers transitioned away

---

[4] Anonymous, Comment to Another 100+ layoff, THELAYOFF (Feb. 5, 2025), https://www.thelayoff.com/t/1jhpa68d3 (last accessed on September 3, 2025).

from on-premise products to cloud-based products, they were utilizing fewer of Manhattan's services, thus further impacting revenue growth; and (iii) Manhattan's Services employees suffered from a lack of work due to the Company's inability to secure new contracts and declining Services demand.

69.    On July 23, 2024, after the market closed, Manhattan held a conference call to update investors on the Company's financial results for the second quarter 2024.    During the call, defendant Capel stated that demand for the Company's products contributed to Services Segment growth.    Specifically, defendant Capel stated:

> Our best-of-breed cloud-native platform and solutions provide continuous access to innovation and are a key component of our customer success. These mission critical solutions help our clients strengthen their relationships with their end customers, drive more revenue and improve efficiency. These powerful benefits are translating into a record solutions pipeline for us with new potential customers representing about 35% of the demand. As ***solid product demand is also fueling opportunities for growth of our internal services organization***, as well as the growing roster of Manhattan Value Partners.

70.    The above statement was materially false and misleading because Manhattan's cloud-based products inherently required less Services; and the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services.

71.     During this same earnings call, defendant Story went on to claim that the Company's "global services teams delivered record revenue totaling $137 million, up 10%" and that "this was in line with our expectations as cloud sales continue to fuel services revenue growth for Manhattan." Defendant Story then explained that Manhattan's "performance was driven by strong cloud and services revenue growth combined with operating leverage as our cloud business continues to scale." Defendant Story also touted the Company's long-term sustainable growth: "[i]mportantly, as Eddie [Capel] discussed, we are very optimistic on our business opportunity and continue to invest in innovation to drive sustainable long-term growth."

72.     Later, during the question-and-answer portion of the earnings call, an analyst asked defendant Story for more color on subscription and Services performance. In particular, defendant Story stated:

> Analyst: If I'm looking at the gross margins for subscription, maintenance and services, that was much higher than we had modeled up north of 300 basis points year-over-year. Anything [sic] call out that that's driving that? Thanks, guys.
>
> Defendant Story: No, *just a positive mix between services and cloud in the gross margins*.
>
> Analyst: Okay. So just more on the mix of the revenue components?
>
> Defendant Story: Yeah.

73.    Defendant Story's statements were materially false and misleading. Manhattan's cloud products eroded the Company's ability to generate Service revenues because the Company's cloud products required less Services and failed cloud implementations caused customers to delay or cancel their contracts, which in turn reduced demand for the Company's Services.

74.    Moreover, defendant Capel discussed the Company's expansion during Manhattan's second quarter 2024 earnings call.  In particular, defendant Capel stated:

> Now, like the last few quarters, our global services team completed over 100 go-lives in Q2 and ***continue to perform very well for our customers***. And while we remain appropriately cautious on the global economy, we continue to invest to drive growth from our numerous opportunities. This includes monetizing strategic investments in industry-leading innovation, further enablement of our customer success, and the expansion of our addressable market. From a hiring perspective, ***we've hired just over 100 new team members year-to-date and plan on continuing our hiring posture for the remainder of the year***.

75.    Defendant Capel's statement was false and misleading when made because, rather than "perform[ing] very well," Manhattan's Services team was not performing well at all.  In fact, multiple former Services employees in the Securities Class Action reported that, as a result of declining Services demand, they had little to no work to do.  Moreover, at this point, Manhattan was not planning to "continue [its] hiring posture," but, as reported by a former employee in the Securities Class Action, had instead enacted a hiring freeze of Services employees in July 2024.  At

this point, Manhattan had also begun laying off its Services employees, as reported by another former employee in the Securities Class Action who noted rounds of layoffs that occurred at different times throughout 2024, including what he described as the biggest one that took place in late Spring or early Summer 2024.  The former employees' reports are corroborated by the numerous threads discussing layoffs on www.thelayoff.com.

76.    An analyst then questioned Defendant Capel about the Company's hiring posture.  In particular, defendant Capel stated:

> Analyst: And then on services, I think there's a commentary about kind of retaining your hiring posture. Maybe just kind of to doubleclick on what exactly you meant there in terms of does that imply kind of hiring for replacement or maybe expanding by, let's say, another 100 heads in the kind of back half? Yeah, just any color would be helpful.

> Defendant Capel: Yeah, **we plan to continue to hire**. Now, the good news is that our attrition rate is – for this year is lower that we had forecasted. So that helps in all kinds of different ways, not at least – not least of which on efficiency, margin, customer satisfaction and so forth, but lower attrition does mean, potentially a little bit less hiring. **But we do definitely plan to expand our team in the second half of the year, for sure. And those hires will be largely in customer-facing and services roles**.

77.    Defendant Capel's response touting the Company's plans to continue to hire and expand its Services team was false and misleading.  Indeed, at this point, Manhattan had already enacted a hiring freeze of Services employees and had begun laying off Services employees, as reported by former employees in the Securities Class Action.

78.    Analysts believed defendants Capel's and Story's misrepresentations. For instance, on July 24, 2024, Rosenblatt issued positive commentary on Manhattan's second quarter 2024 results in a report titled "First Look at Q2 – Healthy Growth Continues During Shift to Cloud Offering" and relied on the assertion that: "Manhattan plans to hire several hundred employees in 2024 to support its Services growth."

79.    Similarly, on July 29, 2024, CFRA maintained a "Buy" rating in its analyst report and anticipated "revenue to increase 12.5% in 2024 and 11.5% in 2025" based upon defendants Capel's and Story's statements.  According to CFRA: "[w]e maintain our Buy rating on shares of MANH on new cloud growth opportunities ahead as the company steps up the pace of release of new cloud-based solutions that would likely build expansion interest from existing customers." CFRA raised its price target from $252 per share to $269 per share, based in part on the fact that Professional Services "rose 9.8% to $136.8M" for the quarter.

80.    On August 6, 2024, Equisights published an analyst report commenting on Manhattan's Q2 2024 statements, finding that: "Manhattan Associates continues to smash expectations with its stellar Q2 2024 results, driven by a balanced demand for software and a successful migration of customers to the cloud. With confidence riding high, the company has upped its fullyear revenue guidance for 2024. We believe the shares are fairly valued."  As to Services Segment revenue, Equisights

found that Manhattan's "global services team is killing it, delivering high-quality implementations that drive customer satisfaction and long-term loyalty," with Services Segment revenue "rising 10% to $137 million" for the quarter. Notably, and based off the false and misleading assurances in the second quarter 2024, Equisights attributed the "significant increase" in Services Segment revenue growth as "primarily driven by the rise in cloud subscriptions. . ."

81.    By September 2024, analysts were concerned with what Manhattan's 2025 full year revenue guidance would be. For instance, Loop Capital published a September 15, 2024 analyst report with a Buy rating for Manhattan stock, at a price target of $284 per share while the Company's stock price was trading at $264 per share. The report further stated that:

> [w]e think the larger question on investors' minds this quarter [i.e., Q3 2024] will be what the company's preliminary 2025 outlook looks like . . . . All in all, we expect MANH's momentum to continue into 2025 and beyond as the firm pulls away as the leader in the WMS space . . . . Driving this is the opportunity in the warehouse market created by the shift to the cloud and continued high win rates from a favorable (and improving) competitive environment. This should drive a multi-year run of mid-to-high teens revenue growth and expanding margins.

82.    On October 22, 2024, after the market closed, Manhattan held its third quarter 2024 earnings call. During the call, defendant Capel touted Services Segment revenue growth:

> For the quarter, total revenue increased 12% to $267 million, and adjusted earnings per share increased 29% to $1.35. Both of these

metrics were above our expectations. ***Driving the top-line outperformance and earnings leverage with solid cloud and services revenue growth across all geographies***, with cloud subscription revenue posting 33% growth in the quarter.

83.    Defendant Capel continued touting the strength of Manhattan's

business model, emphasizing the "robust" demand for Manhattan's solutions and

high customer satisfaction.  In particular, defendant Capel stated:

> ***The Manhattan's business fundamentals are solid, and we remain confident and very optimistic about our business opportunity.*** While the global macro environment remains challenging, ***demand for our solutions is robust, customer satisfaction is high and is evidenced by our recent release of the Manhattan Active Supply Chain Planning Solution, the investments we're making in R&D and our people are creating a clear differentiation***. Delivering consistent market leading innovation is creating more opportunities across supply chain, omnichannel retail and at the world's best – as the world's best brands look to unify and digitally transform.

84.    Defendant Capel also discussed the Company's quarterly success,

explaining such success instilled confidence in Manhattan's ability not only to reach

the "high end" of its targets, but also to achieve "sustainable future growth":

> RPO, remaining performance obligation, increased 27% to roughly $1.7 billion. And as we've often cautioned, large, complex deals can be lumpy on a quarter-over-quarter basis. And whilst we haven't seen much of that lumpiness over the past three or four years, this quarter and, to a lesser extent, last quarter, we have seen some. And our third quarter RPO growth was impacted by some large digital transformational projects pushing out.
>
> ***That said, our fourth quarter is off to a great start, and demand is solid and attributes that give us confidence that we will actually achieve at the high end of our 2024 RPO bookings guidance of $1.8 billion***. Across our industry leading product portfolio and global

pipeline sits at record levels, our win rates remain strong at about 70%. And these factors, despite the uncertain macroenvironment, again, give us confidence that we'll achieve the high end of our 2024 RPO bookings goals, and equally important, are well positioned for continued success in 2025, 2026, and of course, beyond that.

*    *    *

In Q3, 14% of our new bookings were generated from net new logos, and we continue to have a very healthy mix of conversions, upsells and cross-sells. ***And we believe this demonstrates the many and varied opportunities we have for sustainable future growth. And as stated earlier, our solution pipeline is at record levels and new potential customers represent about 35% of that demand. This strong demand is driven by our best-of-breed cloud native solutions that provide continuous access to innovation and are helping our customers digitally transform their businesses to drive success. Our mission critical solutions help our clients improve customer satisfaction, drive more revenue, and improve efficiency***.

85.     Additionally, defendant Capel touted the strong demand that Manhattan was experiencing and how that demand produced growth opportunities and that the services team was performing "very well" for customers.  Specifically, he stated:

And ***this strong demand for our solutions is also fueling opportunities in growth for our internal services organization and our systems integration partners***. In Q3, our global services team completed over 100 go-lives and ***continue to perform very well for our customers***.

86.     Defendant Capel's statements were false and misleading.  In truth, Manhattan's cloud-based products inherently required less Services and the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services.

87.    Later during that same call, Defendant Story touted how cloud sales fueled Services Segment revenue growth.  In particular, he stated:

> Importantly, Manhattan continues to benefit from *a record pipeline that includes solid demand from both new and existing customers, and strong win rates are giving us confidence in achieving the high end of our 2024 RPO bookings outlook and the ability to provide strong 2025 outlook parameters*.
>
> Our global services teams delivered record revenue totaling $137 million, up 7%, *as cloud sales continue to fuel services revenue growth for Manhattan*. Adjusted operating profit was $99 million, with adjusted operating margin of 37.1%. This is 670 basis points year-overyear up. Our performance was driven by strong cloud and services revenue growth combined with operating leverage, as our cloud business continues to scale. As Eddie discussed, *we are very optimistic on our business opportunity and continue to invest in innovation to drive sustainable, long-term growth*.

88.    Defendant Story's statements regarding the Company's "record pipeline" and cloud's ability to "fuel" services revenue growth were false and misleading.  Manhattan's cloud-based software required less Services and diminished the Company's ability to generate Services revenue in connection with these products and the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services.

89.    Defendant Story then provided Manhattan's 2025 outlook.    In particular, he touted the growth in the Services Segment:

> Now moving to 2025, we're going to provide some preliminary parameters here. We are currently in the very early stages of our 2025

budget cycle, and we'll firm up this outlook on our Q4 call as we get through the US election process and our final market analysis. With that, *we are targeting total revenue of $1.13 billion to $1.14 billion, representing 9% to 10% growth*, with license and maintenance attrition masking total growth by 5 percentage points. This includes our cloud revenue target of $415 million, representing 23% year-over-year growth.

For RPO, we are targeting $2.15 billion, which represents 21% growth. *In 2025, we are targeting services revenue of $565 million to $575 million*. The $570 million midpoint represents 8% growth.

In summary, our preliminary 2025 parameters include total revenue, excluding license and maintenance attrition, to increase 14%, cloud revenue to increase 23%, *services revenue to increase 8%,* and RPO to increase 21%, and for an operating margin of 33.5%, while increasing our investment in Manhattan leading innovation. *All-in solid execution by our global Manhattan team and looking forward to the – ending the year strong*.

90.    Defendant Story's statements emphasizing the Company's Services revenue guidance for 2025 were false and misleading.  He failed to disclose that: (i) Manhattan's cloud-based products would continue to pull revenue opportunities away from the Company's Services business given that cloud software inherently required less Services and (ii) the Company's failed cloud implementations caused customers to delay and cancel their contracts, which materially affected the Company's ability to continue to generate Services revenue.

91.    Then, during the question-and-answer part of this earnings call, an analyst asked defendant Story: "on the margin upside, I think it was pretty impressive. Last quarter, I think you called out mix being a tailwind here. Is that also

a story in this quarter? And it sounds like scaling was also a benefit, but just how would you frame kind of the upside that you saw in the quarter and in the guide?" Defendant Story responded: "Absolutely. From a mix standpoint, *it's a fantastic execution by the business, record cloud and services. Yeah, just great performance there.*"

92.    Defendant Story's statement in response to the analyst's question was false and misleading.   Instead of "great performance," Manhattan's Services business was significantly diminished by the facts that: (i) Manhattan's cloud-based products required less Services and (ii) the Company's cloud products suffered from systemic flaws that caused delayed or cancelled contracts, damaged client relationships, and ultimately eroded downstream demand for Manhattan's Services.

93.    Also on October 22, 2024, after the market closed and after its third quarter 2024 earnings call, the Company issued a press release titled "Manhattan Associates Reports Record Revenue and Earnings – RPO Bookings Increase 27% over Prior Year on Strong Demand."  The press release quoted defendant Capel as stating that: "*[o]ur fourth quarter is off to a solid start, and we are providing responsible 2025 parameters*."

94.    Analysts believed the misrepresentations made by defendants Story and Capel in the third quarter of 2024.  For instance, on October 22, 2024, following the statements, Baird Equity Research published an analyst report finding that

"[o]verall, we maintain on positive fundamental view on Manhattan and the potential for upward estimate revisions in FY25," and quoted the false and misleading statements, finding that "Management noted . . . that 4Q24 'is off to great start.'"

95.    Loop Capital issued a similar report on October 22, 2024, finding that Manhattan noted that "Q4 is off to a 'good start' from scheduled Q4 deal closings," and finding that based upon defendants Story's and Capel's statements, "our confidence remains high."  Additionally, William Blair found in their October 22, 2024 analyst report that throughout the third quarter 2024 earnings disclosures, "management highlighted the strong momentum it is seeing across customer cohorts, product suites, and geographic regions. . . ."  The report further stated that "the company continues to see record pipeline activity from both new and existing customers, which we believe illustrates the growing willingness from stakeholders across the ecosystem to modernize operations and consolidate on the company's comprehensive end-to-end platform to unlock deeper connected insights across key business workflows [i.e., transition to cloud]."  The William Blair report concluded that: "Overall, given the mission-critical nature of the company's solutions and its ongoing platform investment, we believe Manhattan is favorably positioned to continue capitalizing on recent demand momentum and support a durable growth runway for the business."

96.    William Blair commented positively on the full year 2025 guidance, given for the first time in the third quarter 2024 earnings disclosures: "Management provided its preliminary outlook for 2025, encompassing total revenue ranging from $1.13 billion to $1.14 billion, representing roughly 10% growth."  The report further stated that: "[w]e believe the company's ongoing platform investments continue to bring transformative capabilities to the Manhattan platform and fuel the strong demand the company is experiencing as well as drive ongoing cross-sell opportunities within its existing base as customers."  Accordingly, William Blair believed that given the ongoing focus on cloud-based products and platforms, the Company would have "cross-sell" opportunities to implement its core Services products on such cloud-based products.

97.    Analysts continued to believe the materially false and misleading narrative that Services Segment revenue would continue to increase given the implementation and migration from on premises software to cloud-based products.  On October 23, 2024, Morningstar Equity published an analyst report following Defendants' Q3 2024 false and misleading statements, finding that: "[d]espite continued deal slippage, management remains comfortable with the pipeline.  The company continues to find success in migrating its customers to the cloud, *which in turn also increases services revenue and ultimately results in operative leverage as its cloud business scales*."

## THE TRUTH EMERGES THROUGH A SERIES OF DISCLOSURES

98.     Through a series of partial corrective disclosures, the Individual Defendants revealed that the Services Segment was not as robust as the Individual Defendants had led investors to believe.  The truth began to emerge on October 22, 2024, after the close of trading, when Manhattan held its Q3 2024 earnings call. During the call, defendant Story disclosed a significant decline of the Company's Services Segment and total revenues:

> Our full year earnings per share midpoint is increasing $0.35 to $4.61 and represents 23% growth compared to the prior year. For GAAP earnings per share, our midpoint increases by $0.36 to $3.48 and also represents 23% growth compared to the prior year. ***This implies Q4 total revenue of $253.5 million, which is $3.5 million lower than our prior Q4 midpoint, as we now anticipate services revenue of $121.5 million***, as the choppy macro environment has resulted in several transformational deal pushes, some customers shifting services projects to 2025, and a more pronounced pausing impact from this year's retail peak season. We are increasing our cloud target to $89.5 million and maintenance revenue upticks to $33.5 million. Our operating margin target is increasing to 32.5% and is up from our prior 30.5% estimate. The Q4 sequential change in operating margin accounts for retail peak seasonality, which as a reminder, is when customers idle implementations to focus on their peak busy season.

99.     The Company's projected fourth quarter 2024 Services Segment revenue of $121.5 million represented a considerable decline from its third quarter 2024 Services Segment revenues of $137 million.  This projected Services Segment revenue decline also caused projected total revenues to fall to $253.5 million, representing a $3.5 million decrease from the Company's prior fourth quarter total

revenues projection.   This also represented a $10.8 million decrease from the Company's third quarter 2024 total revenues of $267 million.

100.   On this news, the Company's market capitalization plunged more than 7.17%, or $20.96 per share, on October 23, 2024, to close at $271.36 per share compared to the previous trading day's closing of $292.32 per share, erasing almost $1.3 billion in market capitalization in a single day.

101.   However, because the Individual Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, Manhattan's stock price remained artificially inflated.   Defendant Capel still exclaimed that Manhattan's "fourth quarter is off to a great start."   Defendant Story told investors that the Company was targeting: (i) full year 2025 Services revenues of $565 million to $575 million, representing a year over year increase of 8% and (ii) full year 2025 total revenues of $1.13 billion to $1.14 billion, representing 9% to 10% year over year growth—all based off Manhattan's cloud-based products "fueling opportunities in growth for our internal services organization."   As a result, investors were left with a false impression about the state of affairs of the Company's business given defendants Story's and Capel's false and misleading statements and assurances on the same day.

102.   Analysts reporting on Manhattan noted "lumpiness" in the third quarter 2024 that extended to the Company's outlook for fourth quarter 2024 but ultimately

felt that the Company's 2025 guidance alleviated any revenue concerns.  For instance, a Baird Equity Research analyst report dated October 22, noted that "3Q24 experienced more pronounced deal lumpiness" which resulted in "narrowing in FY24 revenue guidance on reduced Services outlook into 4Q24." Notably, the analyst report further stated that: "we expect downside is contained by more upbeat forward commentary on the call."

103.   Additionally, a Loop Capital analyst report dated October 22, 2024, attributed the Company's stock decline to the fact that: "the quarter's revenue upside and the 4Q guide came in below what many investors have come to expect."  The report then notes that while "4Q24 total revenue ticks down $3.5M lower than the prior outlook as customers push Services projects into 2025," the Company's "preliminary 2025 view was sound" and Loop Capital's "confidence remains high." An October 23, 2024 Morningstar Equity analyst report noted that "revenue guidance was slightly shy" but emphasized that "[t]he company continues to find success in migrating its customers to the cloud, which in turn also increases services revenue."

104.   In its third quarter 2024 earnings call, the Company also projected that full year guidance for 2025 total revenues would be between $1.13 and $1.14 billion, with Services revenue leading the charge with a $565 to $575 million range.

However, just one quarter later, the Individual Defendants further revealed the extent of declining Services Segment demand and how that impacted Manhattan.

105.   On January 28, 2025, after the close of trading, Manhattan published a press release titled "Manhattan Associates Reports Record Fourth Quarter and Full Year Results."  The press release disclosed that: "[i]n January 2025, the Company eliminated about 100 positions to align our Services capacity with customer demand which has been impacted by short-term macro-economic uncertainty. We expect to record pre-tax restructuring expense in the first quarter of 2025."

106.   That same day, the Company hosted an earnings call to discuss its fourth quarter and full-year 2024 results and its 2025 guidance.  During the call, defendant Story revealed that the Company missed its Q4 2024 Services revenue guidance by over $2 million.  Specifically, he stated that: "[s]ervice revenue of $119 million . . . was $2 million below our prior expectations as budgetary constraints were more pronounced for several customers." Services revenue was down $119.5 million for the fourth quarter 2024 sequentially from $137 million for third quarter 2024—a more than 12% decline.  Further, the $119.5 million for the fourth quarter 2024 represented a miss on guidance given during the third quarter 2024 (of $121.5 million).

107.   During the same call, defendant Capel also revealed weakening demand by reducing the Company's 2025 Services Segment guidance.  Defendant Capel

blamed this reduced guidance on headwinds caused by customers reducing their planned Services work.  In particular, defendant Capel stated:

> ***Near-term headwinds for our services business have surfaced as about 10% of our customers with in-flight implementations reduced their planned services work for the upcoming calendar and fiscal year, and we've adjusted our outlook accordingly***.
>
> ***Now services continues to be very important to Manhattan. Firstly, because that team ensures our customers' success; and secondly, it keeps us close to our customers. And these tight partnerships help us provide clarity on our customers' needs, which in turn incorporates - - allows us to incorporate that in our future waves of innovation, helping us drive future subscription growth***. Now in 2025, we'll have a record number of customer implementations, and those customers will continue to spend significantly on Manhattan services, albeit a little less than we had previously planned.
>
> So to summarize, ***this shift in professional services work to future periods, some deal pushes that we highlighted throughout 2024, and to a lesser extent, reduced customization and higher partner utilization, will cause services revenue to trough in the first quarter of 2025***. With new service implementation projects steadily increasing throughout 2025, we anticipate solid sequential services revenue growth in the middle of the year before returning to year-over-year growth in Q4.

108.    Defendant Story elaborated on Manhattan's reduced full-year 2025 guidance.  Specifically, he stated:

> ***For the full year 2025 guidance, we now expect total revenue of $1.06 billion to $1.07 billion. The $70 million difference from our preliminary parameters consists of $20 million of FX headwind, and as Eddie highlighted, a reduction in services revenue***.
>
> This will result in Q1 total revenue of $256 million to $258 million, and we are targeting total revenue of about $266.5 million in Q2, $273 million in Q3 and $269 million in Q4. For 2025 adjusted operating

margin, we expect a range of 33% to 33.5%, and an FX in the range is unchanged from our prior parameters. On a quarterly basis, at the midpoint, adjusted operating margin is expected to be about 31% in Q1, 33.5% in Q2, 34.5% in Q3, and accounting for retail peak seasonality, 34% in Q4.

*    *    *

So here are some additional details on our 2025 outlook. For full year 2025, we expect cloud revenue of $405 million to $410 million. At the midpoint, this represents 21% growth and ex the FX, the midpoint is unchanged from our earlier parameters. On a quarterly basis, this assumes $93.5 million in Q1, $99.5 million in Q2 and $105 million in Q3 and $109.5 million in Q4.

***For services, we now expect a range of $494 million to $500 million, and assume steady growth improvement throughout the year as new service projects ramp. On a quarterly basis, this assumes $117 million in Q1, $127.5 million in Q2, $130.5 million in Q3, and accounting for retail peak seasonality, $122 million in Q4.***

109.   The revision in 2025 total revenues and Services revenue guidance was significant—down from $1.13–$1.14 billion to $1.06–$1.07 billion for total revenues and down from $565–$575 million to $494–$500 million for Services Segment revenues.  Notably, this was from just one quarter to the next (third quarter to the fourth quarter) and represents a 6% and 13% decline as measured by the midpoints of those ranges, respectively.

110.   During the question-and-answer portion of the call, defendant Capel was questioned about the poor results in Services Segment.  In particular, defendant Capel responded to the following question:

Q (Analyst): . . .Services, you're seeing some sluggishness -- What I'm curious about in services, and maybe it's too early to tell, but part of this is it's a whole different model with the cloud. And you have three plus versions each year, and so there's new stuff coming out. And so I'm just curious where you think we are on cyclicality versus maybe structural dynamics with services going forward?

*     *     *

A (Defendant Capel) Yes. There's no question that we are becoming much more efficient, implementing our software, that's having some impact. Being the now, I think unequivocal leader in the space, there were more and more particularly Tier 1 partners that are implementing our software. So that's having an impact as well. But **there is no question, we've seen pressure on budgets. As our customers went into their budgeting cycle, call it, August, September, October of last year, they were more bullish, I think, about how much they wanted to get completed calendar year 2025**.

And we've got, obviously, a whole cadre of fabulous Tier 1 companies that honestly are going to continue to implement our software during 2025 and spend significant services dollars with us, just not quite as much as the team - their teams are anticipating when they originally budgeted in the fall of last year. **So I think they had their budgets pulled back a little bit, and that trickled down to us**.

111. On this news, the Company's market capitalization plunged more than 33.41%, or $98.59 per share, from January 29 through February 4, 2025, to close at $196.51 per share compared to January 28, 2024's closing of $295.10 per share, erasing over $6 billion in market capitalization over several days.

112. Analysts expressed concern regarding the extent of the Services Segment's drag on the Company. For instance, a Piper Sandler analyst report dated January 28, 2025 stated that "services drags down FY25" was "not the surprise we

were hoping for."   The report further stated that Manhattan's "[s]hares are trading down >20% after hours (despite a Q4 constant currency RPO print above expectations) due to an uncharacteristic FY25 RPO & revenue guide cut. While FX did create an incremental $20M revenue headwind for the year, Services was the larger driver of the weakness, with 10% of customers reducing planned service work for FY25." Piper Sandler went on to point out that: "[n]egatively, Services in the quarter was $119.5M / ~flat Y/Y, missing Street by ~2%.  This implied a fairly material stepdown in the RPO attach rate, as large Tier-1 customers slowed services usage."

113.   Additionally, a Truist Securities analyst report dated January 28, 2025 stated that "services challenges drive weak outlook," specifically stating that: "[i]ssues impacting 2025 outlook & causing 25% AH decline include FX headwinds & meaningful services rev guide cut . . . ." This report emphasized how the Services Segment performed poorly:

> Professional services growth was flat at 0.3% y/y (against 19% y/y growth comp) and totaled $119.5 million, below both our model at $121.5 million and management expectations by $2 million due to pronounced budgetary constraints among several customers. Management called out near term headwinds that have surfaced for its professional services business as ~10% of customers with in-flight implementations have reduced their planned services work for the upcoming year.

114.   The truth was fully revealed when, before the beginning of trading on February 10, 2025, Manhattan filed a Form 8-K with the SEC announcing Defendant

Capel's departure as CEO.  That same day, Manhattan issued a press release titled "Manhattan Associates Announces CEO Succession – Eddie Capel Retires as President & CEO; Succeeded by Eric Clark." The press release disclosed that "Eddie Capel, Manhattan's President and CEO, will retire from his position effective February 12, 2025," just two days later.

115.   Before this, Manhattan never mentioned the possibility of defendant Capel's retirement.  This sudden disclosure shocked investors, who questioned the proximity of Capel's retirement to the revelation of the Company's negative Services performance.  For instance, a Baird Equity Research analyst report dated February 10, 2025, stated "[w]e were not expecting an imminent retirement" and explained that "the optics of a CEO transition after a negative update" was "causing pressure on Manhattan trading."

116.   On this news, the Company's market capitalization plunged more than 11.55%, or $23.20 per share, on February 10, 2025, to close at $177.70 per share compared to the previous trading day's closing of $200.90 per share, erasing almost $1.5 billion in market capitalization in a single day.

## THE DIRECTOR DEFENDANTS CAUSED MANHATTAN TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES

117.   Despite their knowledge, or reckless disregard for, the Company's growth prospects, the Director Defendants approved substantial stock repurchases at

artificially inflated prices.  In July 2024, the Board approved a replenishment of the Company's share repurchase program to an aggregate of $75 million of Manhattan's common stock.  In October 2024 and January 2025, the Board approved more replenishments of the Company's share repurchase program—$75 million and $100 million, respectively.

118.   While the price of Manhattan's stock was inflated due to the false and misleading statements by the Individual Defendants, the Director Defendants caused the Company to repurchase 354,294 shares of its own common stock for a total of $93,566,097 before the truth fully emerged.  Given that the price of Manhattan stock was $177.70 per share after the truth was fully revealed on February 10, 2025, the true value of the repurchased shares was roughly $62,958,044.  Accordingly, the Company overpaid by approximately $30.6 million to repurchase these shares.

## DAMAGES TO MANHATTAN

119.   As a result of the Individual Defendants' improprieties, Manhattan disseminated improper, public statements concerning Services Segment revenue. These improper statements have devastated Manhattan's credibility as reflected by the Company's almost $4.4 billion, or 29.01%, market capitalization loss.

120.   The Company's performance issues also damaged its reputation within the business community and in the capital markets.  Manhattan's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition,

the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

121.    Further, as a direct and proximate result of the Individual Defendants' actions, Manhattan has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)    costs incurred from overpaying approximately $30.6 million to repurchase shares; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Company.

## **DEMAND REFUSED ALLEGATIONS**

122.    Plaintiff brings this action derivatively in the right and for the benefit of Manhattan to redress injuries suffered, and to be suffered, by Manhattan as a direct result of violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Manhattan is named as a nominal defendant solely in a derivative capacity.

123.   Plaintiff will adequately and fairly represent the interests of Manhattan in enforcing and prosecuting its rights.

124.   Plaintiff was a shareholder of Manhattan at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Manhattan shareholder.

125.   On May 29, 2025, plaintiff sent his Demand to defendants Capel, Eger, Hollembaek, Moran, Noonan, and Kuryea and non-parties Clark and Sheer (the "Demand Directors") (attached as "Exhibit A"), demanding that they investigate, address, remedy, and commence proceedings against certain current and former officers and directors of the Company for violations of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment.  Plaintiff urged the Demand Directors to commence these legal proceedings as expeditiously as possible.  Plaintiff also demanded that the Demand Directors reform and improve the Company's corporate governance and internal procedures to comply with all applicable laws and to protect Manhattan from committing future wrongful or wasteful acts.

126.   On July 22, 2025, Demand Counsel acknowledged receipt of plaintiff's Demand and requested proof that plaintiff continuously held Manhattan common stock during the period of wrongdoing and at the time of the Demand (Attached as "Exhibit B").  Demand Counsel did not cite to any law requiring that plaintiff send

proof of contemporaneous ownership.  Demand Counsel's letter also stated that the Board was going to defer the Demand pending resolution of the motion to dismiss in the Securities Class Action.  Demand Counsel did not cite to any law supporting that this de-facto refusal was proper.

127.    Over ninety days have passed since plaintiff made his Demand and the Demand Directors and Demand Counsel have not indicated that the Demand Directors have taken any actions to reform or improve the Company's corporate governance and internal procedures.  The Demand Directors have not taken any steps into investigating the wrongdoing described in the Demand.  In fact, the Demand Directors have refused to make any decisions regarding whether to accept or reject the Demand.

128.    The Demand Directors' failure to initiate litigation or conduct a reasonable investigation was not a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under the law.  Accordingly, the Company remains exposed to additional harm from the wrongful conduct described herein and is not protected against the running of the statute of limitations while the Demand Directors wrongfully refused plaintiff's Demand.

## **FIRST CAUSE OF ACTION**

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

129.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.  During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Manhattan, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

131.  While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices.  The Director Defendants engaged in a scheme to defraud Manhattan by causing the Company to repurchase $93.5 million in shares of its own stock at artificially inflated prices.

132.  The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under

which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Manhattan in connection with the Company's repurchases of its own stock during the period of wrongdoing.

133.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices, and artifices to defraud in connection with the purchase and sale of Manhattan stock, which were intended to, and did: (a) deceive Manhattan and its shareholders regarding, among other things, the Company's projections for Services Segment revenue; (b) artificially inflate and maintain the market price of Manhattan's stock; and (c) cause Manhattan to repurchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, the defendants were in possession of material nonpublic information regarding the above.

134.   The Individual Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as stated above.

135.   The Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the defendants should have been aware of them.  Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

136.   The Individual Defendants' false or misleading statements and omissions were made in connection with the repurchases of Manhattan stock by the Company.

137.   As a result of the Individual Defendants' misconduct, Manhattan has and will suffer damages because it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

138.   Manhattan would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

139.   As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with the repurchases of Manhattan stock during the period of wrongdoing.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

140.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.   The Individual Defendants, by virtue of their positions with Manhattan and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Manhattan and officers and directors who made the false and misleading statements alleged herein within the meaning of section 20(a) of the Exchange Act. The Individual Defendants had the power and influence—and exercised that power—to cause Manhattan to engage in the unlawful conduct and practices complained of herein.

142.   Plaintiff, on behalf of Manhattan, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

Against the Individual Defendants for Breach of Fiduciary Duty

143.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.   The Individual Defendants owed and owe Manhattan fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Manhattan the highest obligation of loyalty and care.

145.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

146.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.  The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly, recklessly, and for the purpose and effect of artificially inflating the price of the Company's securities.

147.  The Individual Defendants failed to correct or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

148.  The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate assets.

149.  The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

150.  Further, by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein, the Individual Defendants caused the Company to overpay by over $30.6 million for repurchases

of its own stock at prices artificially inflated by the false and/or misleading statements.

151.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Manhattan has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

152.    Plaintiff, on behalf of Manhattan, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

**Against the Individual Defendants for Waste of Corporate Assets**

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    As a result of the Company's inadequate controls and materially false and misleading statements concerning the Services Segment revenue, the Individual Defendants have caused Manhattan to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.  The Director Defendants further wasted the Company's assets by causing Manhattan to repurchase over $93.5 million in shares of its own stock at artificially inflated prices.

155.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

156.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Defendants for Unjust Enrichment

157.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.  By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Company.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Company.

159.  Plaintiff, as a shareholder and representative of the Company, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

160.  Plaintiff, on behalf of Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of the Company, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants'

violations of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.      Directing Manhattan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Manhattan and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, particularly regarding Services Segment revenue projections;

3.      a proposal to strengthen the Company's controls over risk management;

4.      a provision to permit the shareholders of Manhattan to nominate at least three candidates for election to the Board; and

5.      a proposal to strengthen Company's oversight of its disclosure procedures;

C.      Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

D.      Awarding to Manhattan restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 22, 2025            **JOHNSON FISTEL, PLLP**

*/s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.
michaelf@johnsonfistel.com
Georgia Bar No. 262062
Mary Ellen Conner
maryellenc@johnsonfistel.com
Georgia Bar No. 195077
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000

619/363-8326 (fax)

**ROBBINS LLP**
Brian J. Robbins
brobbins@robbinsllp.com
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

**RM LAW, P.C.**
Richard A. Maniskas
rmaniskas@rmclasslaw.com
1055 Westlakes Dr., Ste 300
Berwyn, PA 19312

*Attorneys for Plaintiff*